**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| LARRY PAUL TAYLOR AND | § | |
| PAMELA LAVELLE VARNELL, | § | |
| INDIVIDUALLY AND UPON BEHALF | § | |
| OF THE HEIRS OF THE ESTATE | § | |
| OF DAVID PAUL TAYLOR | § | |
|     Plaintiffs | § | |
| | § | CIVIL ACTION NO. 4:11-cv-03740 |
| v. | § | |
| | § | |
| RICHMOND STATE SUPPORTED | § | |
| LIVING CENTER | § | |
|     Defendants | § | |

**FIRST AMENDED COMPLAINT**

    **NOW COMES** Plaintiffs, and bring this, their *First Amended Complaint* alleging that the Richmond State Supported Living Center ("Richmond SSLC") violated the various rights of David Paul Taylor and Plaintiffs as more specifically pled herein. Plaintiffs reserve the right to replead this *First Amended Complaint* if new claims and issues arise. In support thereof, Plaintiffs respectfully show the following:

**I. INTRODUCTION AND BRIEF REVIEW OF THE CASE**

1.    In 2006 the United States Department of Justice ("DOJ") *Office of Civil Rights* began to investigate allegations that the conditions at the various institutions in Texas, serving persons with mental retardation, including the Richmond SSLC, were in violation of the United States Constitution. They DOJ also determined that these violations also ran afoul of various federal laws, including and specifically Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794 and the Americans With Disabilities Act, 42 U.S.C. §12132 et seq.

2.    In. late 2008, the DOJ and the State of Texas entered into a *Settlement Agreement* to

*First Amended Complaint*

address these long-standing concerns. It required that, and among things, persons like David, he one of the most severely and profoundly retarded residents at the Richmond SSLC, be kept free from abuse and neglect, and be given therapeutic, medical and nursing treatments and services in concert with his needs and protecting his civil rights thereby.

3.   Throughout 2010, David failed to receive these necessary treatment services, including and especially treatment for his repeated falls, (purportedly) self-inflicted injuries and related behavioral problems, all as specifically required by the *Settlement Agreement.*

4.   While his treatment team kept a record of his numerous injuries as required by the agreement, most of which occurred in the bathroom, there was no plan developed to deal with this obvious problem. Nor did any staff member receive particularized training to assist in preventing such injuries. Nor did the facility provide the requisite quality assurance or supervision of staff regarding this pervasive problem. If they had completed the correct type of inquiry, they would likely have learned that many of the injuries were caused by the lack of training, negligence or even abuse by staff.

5.   Early in the morning on or around October 5, 2010 David went to the bathroom with the assistance of his aide, Rivers Glover. David was supposed to have a belt tied to him when he walked, so he would not fall. It is unknown if he had the belt on him at that time.

6.   Importantly, as David had no self-help skills, not only was Glover required to walk with and support him, but he had to help take David's clothing and diapers off, transfer him to the toilet, clean him up after using the toilet, put on the diaper and pajamas, and walk him back to bed. On the way back to the bed David decided he did not want to go back to bed so he locked his knees in opposition and refused to move.

7.   David had used this oppositional type of behavior for many years. It was well-known to

2

staff. Here again, the treatment record evidences absolutely no plan on how to help David deal with this specific behavior. Nor is there any evidence in the record that staff was trained on how to deal with this behavior either.

8.  Not surprisingly, an untrained Rivers Glover attempted to push the untrained David Taylor back into bed and not only missed, but pushed David with such force that David hit a side pole of the bed and his stomach ruptured. There was some external bruising so Glover reported the incident to the nurse in charge, Amara Oparanozie, R.N. He reported to the nurse that David had hit his left elbow against the bathroom door.

9.  Early the next morning, on October 6, Glover observed that David now had injuries that had surfaced, to his right upper arm and right upper back. In a note, Oparanozie noted that David was able to move his extremities.

10.  On October 7, a Direct Care Staff member again reported to afternoon shift nursing staff that David again had been injured when going to the bathroom and again had hit the door. Another nurse noted that David was now having problems moving his extremities. This nurse was so concerned she referred David to sick call for the next morning. She also reported her concerns to the Campus Nurse Supervisor for her oversight. As we now know he never made it to sick call.

11.  Another new incident report was completed on October 7, with the informant stating that David had apparently suffered the injuries noted above while lying in his bed. By now the cover-up was in place, someone reported that the reason for the injuries was now because he was hurt by the mattress.

12.  Late on October 7, Oparanozie came to the unit for the overnight shift. The nursing notes reflect she visited David at 10:45pm and again at 4:30am. In those visits, she reported she

3

reviewed David's vital signs on both occasions, which appeared to be normal. At 5:00 am on October 8, Rivers called Oparanozie about his concerns that David was not breathing well. CPR was initiated but David was for all practical purposes, already dead.

13.     The Medical Examiner termed the cause was due to a blunt abdominal trauma and blood poisoning.

14.     The local police authorities investigated David's death. Glover admitted he forcefully pushed David into the bed pole. He also reported that Nurse Oparanozie never ever visited David in his room that night, and never took his vital signs as she had written in David's chart. If she had taken his vital signs she would have learned he was in considerable distress.

15.     There is no documentation that the Nurse Supervisor who was warned about David's deteriorating medical condition, ever followed up on this issue.

16.     It was later determined that David was a victim of abuse by staff, a violation of the *Settlement Agreement* and the Americans With Disabilities Act and Section 504..

17.     It was later determined that David did not receive required nursing care, another violation of the *Settlement Agreement* and the Americans With Disabilities Act and Section 504.

18.     In early 2012, the DOJ issued a follow up report reviewing the changes, if any, that the State and the Richmond SSLC had made during the previous three (3) plus years. Not surprisingly, the DOJ found that Richmond SSLC was still not in compliance with the ADA and other federal laws and standards of care intended to protect David and persons like him.

19.     It is because of the various acts and omissions by the staff at the Richmond SSLC, as even more fully described below that Plaintiffs bring suit against the Richmond State Supported

Living Center for violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794a ("Section 504") and the Americans with Disabilities Act, 42 U.S.C. §12101 ("ADA"). Such equitable and remedial actions pursuant to this act include, but are not limited to, damages, reimbursement of out-of-pocket expenses, attorney fees and costs, as well as other forms of equitable relief.

## II. <u>JURISDICTION</u>

20.    Jurisdiction is conferred upon this Court pursuant to 28 U.S.C.A. §§ 1331 and 1343 because the matters in controversy arise under the laws of the United States as noted above.

21.    This Court has jurisdiction, despite the express language of the Eleventh Amendment to the Constitution of the United States, in light of an express waiver of immunity contained in 42 U.S.C.§2000 d-7 which *essentially* provides that:

> A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973, 29 USCS § 794 or .... Americans with Disabilities Act, 42 U.S.C. §12101 ("ADA"), ....or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.

22.    Finally, this Court has jurisdiction to award attorney's fees and costs to the Plaintiffs pursuant under Section 504 and the ADA pursuant to 29 U.S.C. §794a and 42 U.S.C. §12133.

## III. <u>VENUE</u>

23.    Under 28 U.S.C. §1391, venue is proper before this Court because the events and omissions giving rise to Plaintiffs claims occurred in the Southern District of Texas.

## IV. <u>PARTIES</u>

24.    David Taylor, when alive, was a citizen of the State of Texas, and was at all pertinent times

a resident of Richmond SSLC. It is uncontroverted that he is considered a "qualified individual with a disability," as defined by Section 504 and the ADA.

25.    His parents and natural heirs in this proceeding are Larry Paul Taylor and Pamela Lavelle Varnell, both citizens of the State of Texas and residents of Dallas County and Leon County respectively.

26.    Defendant Richmond State Supported Living Center, formerly known as "Richmond State School" is a residential facility for disabled persons and is administered by the State of Texas. It is uncontroverted that Richmond SSLC is a recipient of federal funds under Section 504 and is a "public entity" under the ADA. Richmond has answered by and through their legal representative, the Honorable Daniel C. Perkins, Assistant Attorney General, Texas Attorney General's Office, General Litigation Division, P.O. Box 12548, Capitol Station, Austin, Texas 78711-2548.

## V. HISTORICAL BACKGROUND

### A. THE FEDERALLY PROTECTED RIGHTS OF PERSONS WITH MENTAL RETARDATION

#### a. Acts of Congress in Support of Equal Rights for the Disabled

##### i. Rights of Children with Mental Retardation in Public Schools

27.    In 1954, the United States Supreme Court issued its landmark decision in Brown v. Board of Education. This case determined that the "segregation of white and colored children in public schools has a detrimental effect upon the colored children" and instills "a sense of inferiority affects the motivation of a child to learn." 347 U.S. 483, 494. After the Brown decision, parents of the children with disabilities began to bring their own lawsuits arguing that schools were segregating the children with disabilities and were likewise victims of

6

discrimination. The *Elementary and Secondary Education Act of 1965* (ESEA) was subsequently passed. Two cases in the 1970's were catalysis for change in the way that children with disabilities were evaluated and identified; <u>Pennsylvania Assn. for Retarded Children v. Commonwealth of Pennsylvania</u>, 334 F. Supp. 1257 (E.D. Pa. 1971) ("PARC") and <u>Mills v. Board of Education of District of Columbia</u>, 348 F. Supp 866 (D.D.C. 1972) ("Mills"). These cases found that the failure to provide publicly supported education and training and the exclusion, suspension, expulsion, reassigning, and transferring of children from regular public schools classes without affording them due process of law violated the Constitutional rights of disabled children.

28.  In response, and in 1972, Congress launched an investigation into the status of children with disabilities and found that millions of children were not receiving an appropriate education. After the investigation, Congress noted that

> parents of handicapped children all too frequently are not able to advocate the rights of their children because they have been erroneously led to believe that their children will not be able to lead meaningful lives....It should not...be necessary for parents throughout the country to continue utilizing the courts to assure themselves a remedy....

29.  This investigation resulted in Public Law 94-142 also known as *"The Education for All Handicapped Children Act of 1975."* Initially, the law focused on ensuring that children with disabilities had access to an education and due process of law. Since that time, Congress has amended and renamed the special education law several times, now it is called the *Individuals with Disabilities Education Act* ("IDEA"). It was most recently amended in 2004. In its re-implementation, the purpose section of IDEA noted:

> ...to ensure that all children with disabilities have available to them a free appropriate public education that emphasized special education and related services designed to meet their unique needs and prepare them for further education, employment and independent living and to ensure that the rights

7

of children with disabilities and parents of such children are protected.

### ii.   Rights Of Persons With Disabilities In Public Facilities - Section 504 of the Rehabilitation Act of 1973

30.     In 1973, Congress promulgated what has come to be known as *Section 504 of the Rehabilitation Act of 1973*, 29 U.S.C. §794. It too is a civil rights law that prohibits discrimination against individuals with disabilities in programs and activities that receive federal financial assistance, like the Richmond SSLC.

31.     It is now well-settled that if a person with mental retardation doesn't receive treatment commensurate with that person's unique and individualized needs, their rights pursuant to Section 504 have been violated. If the various failures by the facility are considered to be deliberately indifferent, intentional or a gross mismanagement of the resident's treatment plan, the person so aggrieved may be able to bring suit for compensatory damages and attorney fees pursuant to the Act.

### iii.   Civil Rights Of Institutionalized Persons Act ("CRIPA")

32.     In 1980 Congress passed the *Civil Rights of Institutionalized Persons Act* (CRIPA), 42 U.S.C. §1997, which was intended to protect the rights of people in state or local correctional facilities, nursing homes, mental health facilities and institutions for people with intellectual and developmental disabilities (mental retardation). CRIPA is enforced by the Special Litigation Section in the United States Department of Justice ("DOJ") Civil Rights Division, which investigates and prosecutes complaints in terms of this legislation. The Special Litigation Section is allowed to investigate state or locally operated institutions in order to ascertain if there is a pattern or a practice of violations of a resident's federal rights.

33.     The right and duty of the DOJ is predicated upon the State receiving federal funds under payments received pursuant to title XVI, XVIII [42 U.S.C.A. §1381 et seq., 1395 et seq.], or under a State plan approved under title XIX [42 U.S.C.A. §1396 et seq.], of the Social Security Act. These acts incorporate by reference, upon the receipt of such funds, and among other things, the State's duty to assure the facility provides services to the resident in concert with all relevant federal law, including and especially Section 504 and the ADA.

### b.   The Supreme Court in Support of Equal Rights for Disabled Persons

34.     In <u>Youngberg v. Romeo</u>, 457 U.S. 307 (1982), the Supreme Court determined what constitutional rights existed for persons with mental retardation when receiving residential care services by a state. The named Plaintiff, Nicholas Romeo was mentally retarded with an IQ of an infant, was restrained for many hours of the day, was not given individualized treatment and was repeatedly injured.

35.     The Supreme Court agreed with the Third Circuit Court of Appeals that persons in such facilities had a constitutional right to reasonably safe confinement conditions, no unreasonable restraints and the habilitation they reasonably require. The critical issue in the case was the standard of care and whether the State had violated that standard, and therefore, Romeo's federally-protected civil rights. The federal courts had not yet addressed this question in the context of mental retardation. The trial court therefore looked to a then-recent Supreme Court decision holding that <u>deliberate indifference</u> (emphasis added) to serious medical needs of prisoners constitutes "unnecessary and wanton infliction of pain" in violation of the Eighth Amendment. The jury found for the defendants.

36.     The Third Circuit reversed and ordered a new trial, explaining that the standard of care

9

should have been based on the Fourteenth rather than the Eighth Amendment and the

Supreme Court agreed. However, the high court rejected the circuit court's articulation of

the "deliberate indifference" standard of care in regarding to construing constitutional

violations in such an institution. The syllabus summarizes the court's holding:

> Respondent [Romeo] has constitutionally protected liberty interests under the Due Process Clause of the Fourteenth Amendment to reasonably safe conditions of confinement, freedom from unreasonable bodily restraints, and such minimally adequate training as reasonably may be required by these interests. Whether [his] constitutional rights have been violated must be determined by balancing these liberty interests against the relevant state interests. The proper standard for determining whether the State has adequately protected such rights is whether professional judgment, in fact, was exercised. And in determining what is 'reasonable,' courts must show deference to the judgment exercised by a qualified professional, whose decision is presumptively valid.

    c.   The Continuing Application of Federal Law to Protect the Disabled in Texas

37.     In November of 1974, a class action lawsuit known as <u>Lelsz v. Kavanagh</u>, 5-74-95-CA,

was filed in U.S. District Court for the Eastern District of Texas. The suit alleged that the

civil rights of mentally retarded people residing in state schools were being violated. The

suit sought relief not in the form of money, but in improvements. Lelsz was a resident of

one of the state schools and Kavanagh was John J. Kavanagh, former commissioner of the

Texas Department of Mental Health and Mental Retardation. In August of 1981 U.S.

District Judge William Wayne Justice of Tyler certified a class in the lawsuit of both

current a future residents of the various Texas State School's for persons with mental

retardation.

38.     In 1982 <u>Youngberg v. Romeo</u> was decided.

39.     In July of 1983, the Plaintiffs, which now included all the state school residents and three

advocacy organizations for the mentally retarded, and the state reach an resolution and

settlement agreement prior to trial. The agreement outlines living standards and treatment requirements schools must provide residents.

40.     In June of 1985 Judge Justice ordered that 279 residents of Austin, Denton and Fort Worth State schools be placed into community residents by Aug. 31, 1986. The State Department of Mental Health & Mental Retardation complied with the order, but appealed the Court's order. In November the case was transferred to U.S. District Court for the Northern District of Texas, Judge Barefoot Sanders presiding. In January of 1987 the Fifth Circuit Court of Appeals overturned that part of the order requiring transfer of residents to community services.

41.     In May of 1987 the Texas Legislature enacted measures requiring MHMR enact new rules regarding the treatment and habilitation of state school patients. In August, Judge Sanders found MHMR in contempt of court for failing to provide adequate care residents at the state schools. Rather than impose fines or jail terms, Sanders ordered the parties to provide proposals for improvement by October of that year. He later approved the agreement order in the contempt ruling, which was designed bring the state into compliance with original resolution and settlement agreement regarding minimum standards of treatment.

42.     In August of 1990, the parties in that lawsuit took steps to reach settlement to end the long-running lawsuit. On December 30, 1991 Sanders accepted the settlement agreement, setting in motion the litigation's end. It was the hope of the parties and the Court that persons with mental retardation would finally receive the therapeutic services and protections as contemplated by the U.S. Constitution and federal law intended to protect persons with disabilities.

43.     Separate and apart from Lelsz, and during this same period, was the Savidge v. Fincannon,

11

836 F2d 898 (1988) case. Jonathan, a profoundly retarded fifteen-year-old boy, was living at the Fort Worth State School for the retarded (FWSS) and in 1983, sued Texas, the Texas Department of Mental Health and Mental Retardation and four individual employees of the FWSS regarding the substandard care he was receiving.

44.   According to the Savidges' complaint, living conditions at the FWSS were "oppressive, inappropriate, unhealthy, filthy, abusive and restrictive." Among other allegations, that the building Jonathan lived in was "permeated with stench," that Jonathan and other residents were left "to play in each other's feces," that Jonathan's medications were poorly monitored, that Jonathan was repeatedly bitten by other residents, and that the wheelchair he used was so small (it was the original one he had when he entered FWSS as a minor) that it worsened the spinal condition (scoliosis) that afflicted him.

45.   More importantly, it asserted that the conditions at the FWSS violated Jonathan's constitutional right to reasonably safe institutional medical and nursing care. One episode illustrated the seriousness of the claim. Staff apparently assigned Jonathan, a child known to have a special susceptibility to infection, to a ward in the FWSS with a "dangerously high level of infectious staphlococcus [sic] bacteria." Shortly thereafter, he suffered a severe fever and "infected boils." He developed a hand-sized swelling on the right side of his rib-cage that required surgery that left him partially paralyzed.

### d.   The Americans with Disabilities Act ("ADA")

46.   The *Americans with Disabilities Act of 1990* (ADA) is a law that was enacted by the U.S. Congress in 1990 and was signed into law on July 26, 1990 by then President George H. W. Bush. The ADA was intended as a wide-ranging civil rights law that prohibited, under certain circumstances, discrimination based on disability. It afforded to persons with a

disability and victims of discrimination based upon disability, the same protections afforded Americans, as noted in the *Civil Rights Act of 1964*, which made discrimination based on race, religion, sex, national origin, and other characteristics illegal. Disability is defined by the ADA as "a physical or mental impairment that substantially limits a major life activity." Importantly, any determination of whether any particular condition is considered a disability, or there is discrimination based upon disability, is made on a case by case basis.

47.    The "original intent" of the law, as co-conceived by Lex Frieden and Mitchell J. Rappaport, was to create civil rights law protections for people with disabilities that would be permanent, would not be able to be reversed or weakened, and would prohibit all discrimination. It was also intended so that Americans with disabilities would be kept in the mainstream and provide civil rights protections and public law changes for Americans with physical, mental and cognitive disabilities. It was intended to be a flexible set of laws that could only be strengthened, not weakened, by future case law.

### e.  The Supreme Court II

48.    In <u>Olmstead v. L.C.</u>, 527 U.S. 581 (1999), the Supreme Court heard a case regarding discrimination against persons with mental retardation who live in state administered facilities, based upon violations, among other things, of the ADA.

49.    The Court first easily found that under the ADA, mental retardation illness is a form of disability and therefore covered under the ADA. Further, that Title II of the act applies to public entities and includes state and local governments and that it protects any "qualified person with a disability" from exclusion from participation in or <u>denied the benefits</u> (emphasis added) of services, programs, or activities of a public entity.

13

### f.   ADA Amendments Act

50.   On September 25, 2008, President George W. Bush signed into law the ADA Amendments Act of 2008 (ADAAA). These amendments were intended to give even broader protections for disabled persons and "turn back the clock" on court rulings which Congress deemed too restrictive of the ADA.

### B.   THE INVESTIGATION OF THE STATE BY THE DEPARTMENT OF JUSTICE

### a.   The Investigation of Treatment in Texas State Schools

51.   All State of Texas facilities receive Medicaid funding from U.S. Department of Health and Human Services (HHS"). For Medicaid purposes, each of the Facilities is certified to care for individuals as an Intermediate Care Facility for the Mentally Retarded ("ICF / MR"). As a condition of receiving Medicaid funds as an ICF /MR, the Centers for Medicare and Medicaid Services ("CMS") requires a regular survey of conditions and investigation of certain incidents reported at participating institutions, including the Facilities. CMS's 2006 and 2007 surveys identified significant care and safety deficiencies at more than two-thirds of the facilities in Texas, including instances of "immediate jeopardy," which placed certain Facilities in danger of losing Medicaid certification and funding.

52.   With this information and concern, the United States Department of Justice (DOJ) soon began a statewide investigation of Texas State Schools serving persons with mental retardation regarding allegations of abuse, neglect and violations of patient's rights. The DOJ was particularly concerned about residents, like David Taylor, who had multiple disabilities, i.e.; were medically fragile, had eating disorders, Pica, behavioral problems, ambulation issues, multiple falls, multiple reports of self-injurious behaviors, inability to communicate and a mental health diagnosis.

14

53.     On December 1, 2008 the DOJ issued their findings noting that the State, including the

Richmond State School, were cited for 36 deficiencies, including, but not limited to (a)

failure to ensure clients' rights were protected, including the right to be free from abuse,

neglect, and mistreatment; (b) failure to ensure that clients were free from unnecessary

restraints and received active treatment; (c) failure to have sufficient direct care staff to

meet the needs of clients; (d) failure to protect clients from abuse during investigations; (e)

failure to provide initial and ongoing staff training; (g) failure to show that all allegations of

abuse, neglect, or mistreatment were thoroughly investigated; and (h) failure to provide

clients' health care services, prompt treatment, preventative services, and appropriate

follow-up care.

54.     Most importantly, and relevant to this case, the report noted:

> We found that many of the Facilities' risk management practices fail to
> identify residents' risks and fail to implement preventive strategies
> necessary to keep residents free from harm and risk of harm. Facility
> residents face a myriad of physical, mental, and behavioral challenges that
> increase their susceptibility to self injury, injury or abuse from others, or
> complications associated with medical, mental health or behavioral
> conditions. Moreover, a significant number of Facility residents are
> medically fragile, non-verbal or require assistive devices to communicate,
> or are non-ambulatory. Therefore, many Facility residents are incapable of
> protecting themselves from harm or reporting incidents of abuse or neglect.

55.     In addition, in regard to injuries, the report noted:

> Many other Facility residents suffer significant preventable injuries
> resulting from seizures and falls. We also found that a significant number of
> residents' injuries are discovered as opposed to witnessed by staff, strongly
> suggesting that residents are being neglected. Moreover, we found that the
> Facilities were not referring residents to physicians in a timely manner
> following injuries, which thereby needlessly prolonged residents' pain and
> suffering. Many Facility residents have sustained serious injuries from falls,
> and yet, are not identified by the Facilities as being at risk of falling. In fact,
> some of the Facilities do not regularly maintain a list of residents at risk for
> falls, suggesting that these Facilities do not currently identify individuals as

risk for falls and do not implement preventative measure to prevent falls in residents who have fallen repeatedly.

56.     In addition, and in regard to nursing, the report noted:

Too often, nurses only respond to known or apparent health problems when they reach acute status, rather than providing timely interventions to prevent or mitigate the occurrence of acute problems.

### b.   The Settlement Agreement between Texas and The Department of Justice

57.     In late 2009, and as a result of the DOJ investigation, Richmond State School, along with the State of Texas and other Texas facilities, entered into a Settlement Agreement requiring that they (a) immediately implement policies, procedures, and practices that require a commitment that they shall not tolerate abuse or neglect of individuals and that staff are required to report abuse or neglect of individuals; (b) implement incident management policies, procedures, and practices, requiring Staff to immediately report serious incidents, including, but not limited to death, abuse, neglect, exploitation, and serious injury; ( c) mechanisms to ensure that, when serious incidents such as allegations of abuse, neglect, exploitation, or serious injury occur, staff take immediate and appropriate action to protect the individuals involved; (d) competency-based training for all staff on recognizing and reporting potential signs and symptoms of abuse, neglect, and exploitation; (e) notification of all staff of their obligation to report abuse, neglect, or exploitation; and (f) audits to determine whether significant resident injuries are reported for investigation.

58.     The parties noted that use of video cameras throughout the facility would help assure greater safety for residents and freedom from abuse, neglect and exploitation.

### c.   The Continued Abuse of Persons with Mental Retardation at State Schools

59.     In 2009 the story about the "Fight Club" at the Corpus Christi State School broke, whereby

eleven (11) employees were accused of encouraging fights among mentally and developmentally disabled residents. It was determined, and among things, that these staff members were both inexperienced, poorly trained and poorly supervised.

60.    Later that year, Michael Nicholson, 45, a resident at the Lubbock State School died while in the care of state school employee Doneil Smith. During the investigation, it was reported that Nicholson, who was also mentally ill and profoundly mentally retarded (like Taylor) became agitated and that Smith restrained Nicholson by repeatedly sitting on him. Nicholson died of suffocation during the struggle.

### d.   The Investigation of Treatment in State Schools by the DOJ II

61.    In 2012, the DOJ completed a follow up investigation and report of the Richmond State School. In a 360 page report, while they found substantial effort and compliance in many areas, they still found certain areas problematic.

62.    Importantly, and in regard to abuse and neglect reporting, the Monitoring Team had a continuing concern. They believed various improvements were still needed in that most investigations by the facility were insufficient in scope and depth, were not reported in a timely manner or reported at all. They noted that the review of investigations of discovered injuries, including even non-serious injuries, was an important process to ensure all instances of possible abuse and neglect are discovered and reported and most importantly prevented. Importantly the Team found the facility substantially out of compliance in training of staff on this issue.

63.    In addition, and in regard to risk assessment, the Team noted that treatment staff still did not conduct assessments when there was a severe health risk identified or a change in a resident's circumstances. Importantly, even when completed these assessments were not

17

sufficiently comprehensive to enable the interdisciplinary team to address risk, treatment and prevention.

64.    In regard to quality assurance improvements, the Team not the facility still did not have an organized process to use monitoring data to routinely and consistently develop a Corrective Action Plans for residents at risk for injury.

65.    Further, that Treatment Team meetings failed to conduct comprehensive assessments of sufficient quality to reliably identify the individual's strengths, preferences and needs and did not consistently specify individualized, observable and/or measurable goals/objectives, the treatments or strategies to be employed, and the necessary supports to attain identified outcomes related to each preference and meet identified needs, including and especially training of staff.

66.    In regard to nursing assessments, the nursing summaries continued to have problems in critically analyzing clinical data derived from the assessments, for each identified nursing problem/diagnosis, to accurately reflect whether individuals' health status was improving, maintaining, or regressing; health care plans continued to lack adequate individualization to meet individuals' specific problems and plans did not demonstrate an integration with other disciplines to meet the total needs of individuals.

67.    In regard to the physical management of the residents, staff were observed to not be implementing personal management plans or displaying safe practices to minimize the risk of decline in personal skills. Most importantly, there was no process in place to ensure supports for individuals who were determined to be at an increased level of risk were only provided by staff who have received the competency based training specific to the individual.

18

68.     In short, while many of the problems that were brought to light in the 2009 report had improved, there were still significant and substantial issues of concern, especially and most importantly in those treatments and services that would most effect the health, life and death of David Taylor.

## C.  THE RICHMOND STATE SCHOOL

69.     Richmond is located in the City of Richmond, which is in the greater Houston metropolitan area. At the time of the first DOJ report, this facility had 664 beds for temporary respite admissions, emergency services, and long term placements for individuals with mental retardation or developmental disabilities. In that report the DOJ noted, and as a matter of context, the recent surveys from CMS and the Social Security Administration corroborated the DOJ findings regarding that this specific facility. The DOJ noted that the most recent comprehensive CMS inspection of the Richmond State School had occurred on January 12, 2008.

70.     At that time, CMS cited Richmond for 36 deficiencies regarding federal standards, including, but not limited to: failure to ensure clients' rights were protected, including, the right to be free from abuse, neglect and mistreatment; failure to ensure that clients were free from unnecessary restraints and received active treatment; failure to have sufficient direct care staff to meet the needs of clients; failure to protect clients from abuse during investigations; failure to provide initial and ongoing staff training; failure to show that all allegations of abuse, neglect, or mistreatment were thoroughly investigated; and failure to provide client' health care services, prompt treatment, preventative services, and follow-up care.

71.     Importantly, while some of the residents at the RSSLC have jobs in the community or on

campus, and live semi-independently in campus cottages, others are confined to bed; their physical and mental disabilities so severe that around-the-clock care is needed. The Neches Unit, where David Taylor was housed, was one such unit.

## VI. <u>FACTUAL RESUME</u>

### A. ABOUT DAVID TAYLOR

72.   David Paul Taylor was born prematurely after just 26 weeks on May 18, 1982. Throughout the rest of life, David failed to meet to meet any developmental milestones. Ultimately, David was diagnosed with severe autism and profound mental retardation. His IQ was considered to be less than 20.

73.   David's disabilities were so severe that he never learned to speak or to communicate in any reliable way. He had no self-help skills and needed to be fed, bathed and toileted, like an infant.

74.   David also had a severe Behavior Disorder, and would slap himself, bang his head and dig flesh from cheeks, temple, thumbs and fingers. He would also pack items like paper and bandages into his nose. He had a "Pica" a disorder where he would attempt to put in his mouth and eat non-food items. During his teenage years, it became so hard for mother to manage him at home that it became necessary to admit David into residential facilities during the day.

75.   Importantly, not only was David difficult to manage because he was totally dependent upon staff for all his needs, but maybe more importantly, he was often adverse to their very attempts to assist him. David would become aggressive with other residents and staff as well, and would bite, slap and kick at them, often accompanied with extremely loud screaming.

76. Due to these severe behaviors, David was not even capable of remaining at the residential center in the community. In 2004, and at the age of 22, David was admitted as a permanent resident to the Richmond SSLC, a more restrictive and secure environment. His mother hoped that he would receive the intensive behavioral treatments and interventions necessary so that he could move back into a residence in the community.

77. Frankly, among the many persons with mental retardation at the Richmond State Supported Living Center, David was among the most difficult to treat. He was placed on the Neches Unit, a place where other persons with severe disabilities like himself were residents. Even among this sub-group of extremely disabled persons, he was even more disabled then most, requiring one-to-one supervision during waking hours and what was termed "enhanced supervision" after going to bed.

78. One of his biggest problems was with what is termed rumination or vomiting.

79. A review of his chart notes dozens close to a hundred episodes of injuries during his stay at this facility. In the year before his death his annual medical report noted:

    a. On 6/25/09, he was seen in Sick Call for self-injurious behavior of hitting which caused left forehead skin abrasion;

    b. He was seen Sick Call for head-banging and sustained soft tissue injury that was not acute on 7/22/09;

    c. He was seen in Sick Call on 8/19/09 for forehead laceration;

    d. He was seen in Sick Call on 9/30/09, for left eyebrow laceration;

    e. He was seen for a left eyebrow laceration on 10/08/09;

    f. On 10/14/09, he was followed in Sick Call for scab on left eyebrow;

    g. On 10/17/09 he was seen for forehead laceration due to self-injurious behavior

21

(SIB);

h.      On 11/03/09, there was report that he hit himself in his left forehead with his hand;

i.      There was alleged abuse on 11/22/09 but no physical injury was noted;

j.      On 12/04/09, he was referred to Sick Call for weight loss of 6 lbs. in a month. He was noted to have severe rumination and increased behavior disorder;

k.      On 12/29/09, he was seen in Sick Call with skin bruising to bilateral scapular area and the left calf;

l.      He was seen in Sick Call on 1/02/10 for right eyebrow laceration;

m.      On 1/12/10 he received a laceration to right eyebrow from fall;

n.      On 2/09/10 he was seen for slapping self on the face causing mild erythema and no hematoma on left side of forehead;

o.      On 3/09/10, he was seen for frontal scalp soft tissue injury due to head-banging;

p.      On 3/14/09, he was seen a left forehead abrasion due to head-banging.

q.      On 3/22/10 he was seen for bilateral scalp soft tissue injury.

r.      He was seen in Sick Call on 3/26/10 for Self Injurious Behaviors (SIB);

s.      He was seen on 3/27/10 for head-banging;

t.      On 3/29/10, he was seen for SIB and left eyebrow bruising; and

u.      On 3/30/10, he sustained a right eyebrow moderate laceration from fall due to obsessive compulsive behaviors.

80.     There is no risk-management analysis or assessment noted in David's chart.

## B. DAVID'S TREATMENT PLAN

81.     David Taylor had multiple disabilities and concerns. His treatment plan reflected interventions due to the fact he was medically fragile. The plan also provided services and

interventions related to his eating disorders and that he had "rumination" or severe vomiting, which affected his weight.

82.     His treatment plan also noted problems with Pica and multiple self-injurious behavioral problems.

83.     The plan also contemplated that David had significant issues in ambulation.

84.     Importantly, the plan recognized David was a major risk for falling.

85.     He also multiple reports of self-injurious behaviors, inability to communicate and a mental health diagnosis.

86.     Due to his disabilities, David was ordered to have 1:1 supervision at all times per doctor's orders.

87.     As a matter of course, any such person working with David needed to be effectively trained and supervised. Unfortunately, they were not.

88.     In David's treatment record, his problem with rumination (vomiting or *emesis*[1]) is the <u>only</u> identified problem where staff received training specifically identified to one of David's problems.

89.     This problem was also generally treated with medication and changes in food types.

90.     The failure to correctly train David and staff ultimately led to his injury and death.

### C. THE FAILURE TO KEEP DAVID SAFE FROM HARM AND PROVIDE HIM NECESSARY NURSING CARE

91.     Early in the morning on or around October 5, 2010, David went to the bathroom with the

---

[1] Importantly, if a person's jejunum (middle section of the small intestine) is impacted by blunt force, this emesis (or vomiting) reflex will be initiated. As we now know it was this severe impact that caused his death. It is highly likely that David's rumination (vomiting) problem was not necessarily caused by any internal problem he may have had but rather by ongoing trauma to this area. Certainly, if he had ever received the correct risk-analysis for injuries in his bedroom and bathroom, the truth or falsity of this issue, could likely have been determined.

assistance of his aide, Rivers Glover.

92. David was supposed to have a belt tied to him when he walked, so he would not fall. It is unknown if he had the belt on him at that time. There is no apparent record kept on this

93. Importantly, as David had no self-help skills, not only was Glover required to walk with and support him, but he had to help take David's clothing and diapers off, transfer him to the toilet, clean him up after using the toilet, put on the diaper and pajamas, and walk him back to bed.

94. On the way back to the bed David decided he did not want to go back to bed so he locked his knees in opposition and refused to move.

95. David had used this oppositional type of behavior for many years.

96. Not surprisingly, an untrained Rivers Glover attempted to push the untrained David Taylor back into bed.

97. Glover missed the bed but actually pushed David into a pole on the bed.

98. Importantly, Glover pushed David with such force into the bed-post that his stomach ruptured.

99. There was some external bruising so Glover reported the incident to the nurse in charge, Amara Oparanozie, R.N. In that report, Glover started that David had hit his left elbow against the bathroom door.

100. Early the next morning, Glovers observed that David now had injuries that had surfaced, to his right upper arm and right upper back.

101. In a separate nursing note, Oparanozie, R.N., noted that David was apparently able to move his extremities.

102. On October 7, 2010 another Direct Care Staff member reported to the afternoon shift

24

nursing staff that David again had been injured. Specifically, that he hurt when going to the bathroom and again had hit the door.

103.    Another nurse on the Neches Unit reported that David was now having problems moving his extremities. This nurse was so concerned she referred David to sick call for the next morning. She also reported her concerns to the Campus Nurse Supervisor for her oversight. As we now know he never made it to sick call.

104.    In addition, another new incident report was completed on October 7. This time the staff person stated that David had apparently suffered the injuries noted above while lying in his bed because of problems with the mattress.

105.    Late on October 7, Oparanozie came to the unit for the overnight shift as did Glover. The nursing notes reflect she visited David at 10:45 p.m. and again at 4:30 a.m.

106.    In those visits she reported she reviewed David's vital signs on both occasions, which appeared to be normal.

107.    At 5:00 a.m. Rivers called Oparanozie about his concerns that David was not breathing well. CPR was initiated but David was for all practical purposes, already dead.

**D. THE INVESTIGATION OF THE DEATH OF DAVID TAYLOR**

108.    After the death of David Taylor, local law enforcement authorities investigated the incident.

109.    Rivers Glover admitted that when Taylor locked his legs he attempted to push him into bed but actually pushed David into a pole on the bed.

110.    He also admitted he pushed David with excessive force.

111.    Glover also told the investigator that the nurse in charge that night, Amara Oparanozie, R.N., never actually went into the room to assess Taylor's vital signs. Rather, that her

25

entries on Taylor's record that she had in fact observed him and actually had taken his vital sign, was not true.

112.   Stephen Puslinick, M.D., Chief Medical Examiner, diagnosed that David had a "blunt abdominal trauma with associated rupture of jejunum[2] and bacterial peritonitis[3]. In addition that there was an acute "hemorrhage within the left thryohyoid muscle" in the neck area.

113.   He also had cerebral edema which is an excess accumulation of water in the intracellular or extracellular spaces of the brain. It is often considered as a response to trauma.

114.   The doctor opined that the cause of death was blunt abdominal trauma.

115.   He further recommended that it was a homicide.

116.   It has been opined that because of the high bacterial count associated with peritonitis, that if Nurse Oparanozie had completed the required nursing assessment of Taylor, with the taking of vital sign, in a timely manner, he likely would have survived his injuries.

117.   On or about June 13, 2011 Rivers Glover was charged with a felony indictment of "Injury To A Person With A Disability."

118.   Amara Uloaku Oparanozie, R.N., was indicted as a Co-Defendant.

### E.  MISCELLANEOUS

119.   As noted above and in late 2008, the DOJ and the State of Texas entered into a *Settlement Agreement* to very specifically address concerns about abuse and nursing care for persons like David.

120.   David was one of the most severely and profoundly retarded residents at the Richmond

---

[2] As noted above, trauma to the jejunum or small intestine area causes a natural reflex to vomit.

[3] Peritonitis is an inflammation of the peritoneum, the thin tissue that lines the inner wall of the abdomen and covers most of the abdominal organs.

SSLC.

121. David was one of the most severely and profoundly retarded residents on the Neches unit.

122. Throughout 2010 David failed to receive these necessary treatment services, including and especially treatment for his repeated falls, supposedly self-inflicted injuries and related behavioral problems.

123. Based on the injuries and treatments noted above, it is hard to believe he actually received the 1:1 services that were required.

124. While David's treatment team did keep a record of his numerous injuries in 2009 and 2010, a review connotes that most occurred in the bathroom or in his bedroom. There is no evidence that the facility completed a risk assessment on this obvious issue.

125. As a result, there was no plan developed to deal with this obvious problem.

126. As a result ,there was no particularized training for staff to assist in preventing such injuries in the bedroom or at the bathroom.

127. Nor did the facility provide the requisite quality assurance or supervision of staff regarding this pervasive problem. If they had completed the correct type of inquiry they would likely have learned that many of the injuries were caused by the lack of training, negligence or even abuse by staff.

128. In addition, David had many types of oppositional behaviors, including the locking of his knees when did not want to move. These various behaviors were well-known to staff.

129. The treatment record reflects no particular behavioral management or intervention plan on how to work with David on this specific behavior.

130. Importantly, there is no evidence in the record that staff was trained on how to deal with this behavior either.

131. David was provided a "gait-belt" to be used when he walked, so he would not fall. There is no apparent record kept on this important requirement.

132. In the 24-48 before David's death, Richmond State School Nurse Supervisor was advised of his deteriorating medical condition, but failed to do anything in response.

133. In the hours before his death, Amara Oporanozie, R.N., was advised that there were significant problems in David's ability to move his extremities, but she did nothing to follow up on this issue.

134. In fact, not only did Oporanozie not follow up on this particular issue, she also failed in her general duties as well.

135. Specifically, she was supposed to check on his vital signs throughout the night but failed to do so.

136. Notwithstanding this failure she did write in the chart that she did check David's vital signs.

137. She too was not correctly trained.

138. She too was not correctly supervised.

139. There was no video camera in David's bedroom and bathroom, the very places where he was most apt to be injured.

140. Texas continues to rank 49th out of 50 states when it comes to per-capita funding for services for persons with mental health disorders or with mental retardation.

## VII. CLAIMS FOR RELIEF PURSUANT TO SECTION 504

141. Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

142. Section 504 of the Rehabilitation Act of 1973 and its implementing regulations require that

each state that receives federal disbursements, including the state=s political subdivisions, must ensure all persons with disabilities are given appropriate and necessary accommodations, pursuant to federal law and rules. To the degree that a policy or practice hinders honest consideration of a disabled person's unique needs and fails to accommodate that person's disability, it violates Section 504.

143.   A violation of Section 504 exists in this cause because the Richmond SSLC, a recipient of federal disbursements, did not provide him treatment services, to the extent required under the law.

144.   A violation of Section 504 exists in this cause because the Richmond SSLC, a recipient of federal disbursements, has acted in bad faith or with gross misjudgment as to David Taylor's individualized treatment plan.

145.   In addition and in the alternative, a violation of Section 504 exists in this cause because the Richmond SSLC, a recipient of federal disbursements, provided services to David that were a gross deviation from professionally accepted standards of care.

146.   In addition and in the alternative, a violation of Section 504 also exists because the Richmond SSLC has intentionally discriminated against David Taylor due to his severe disabilities.

147.   In addition and in the alternative, a violation of Section 504 also exists because the Richmond SSLC were deliberately indifferent to the rights of David Taylor due to his severe disabilities.

148.   Moreover, and also in addition and in the alternative, a violation of Section 504 also exists because the Richmond SSLC had policies, practices and customs which were facially neutral but David Taylor received disparate treatment due to his severe disabilities.

149. Further, and also in addition and in the alternative, a violation of Section 504 also exists because the Richmond SSLC had policies, practices and customs which were facially neutral but had a disparate impact on David Taylor due to his severe disabilities.

150. Because of any and all of the above, Plaintiffs are entitled to recover compensatory damages for the negligence abuse of David, including the damages that were suffered by him both during and after the fatal attack, but also on behalf of his parents and beneficiaries under applicable law.

## VIII. CLAIMS FOR RELIEF UNDER THE ADA

151. Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

152. As a public entity, Richmond SSLC is obligated to provide treatment, support and services to patients consistent with Title II of the Americans with Disabilities Act and implementing regulations. 42 U.S.C. § 12101 *et seq.*, 28 C.F.R. § 35.

153. Such acts and omissions by staff at the Richmond SSLC, as more fully described above, including and especially the failure to provide him treatment services commensurate with his unique and individualized needs, violated his rights pursuant to Title II of the ADA, 42 U.S.C. § 12132, *see also* 28 C.F.R. §35.130.

154. Such acts and omissions by staff at the Richmond SSLC, as more fully described above, including and especially the neglect of David Taylor, all on the basis of his severe disabilities, thereby violated Title II of the ADA, 42 U.S.C. § 12132, *see also* 28 C.F.R. §35.130.

155. Such acts and omissions by staff at the Richmond SSLC, as more fully described above, including and especially the abuse of David Taylor, all on the basis of his severe

disabilities, thereby violated Title II of the ADA, 42 U.S.C. § 12132, *see also* 28 C.F.R. §35.130.

156.    Such acts and omissions by staff at the Richmond SSLC, as more fully described above, including and especially the denial of necessary nursing care, all on the basis of his severe disabilities, thereby violated Title II of the ADA, 42 U.S.C. § 12132, *see also* 28 C.F.R. §35.130.

157.    Such acts and omissions by staff at the Richmond SSLC, as more fully described above, including and especially the denial of necessary medical care, all on the basis of his severe disabilities, thereby violated Title II of the ADA, 42 U.S.C. § 12132, *see also* 28 C.F.R. §35.130.

158.    Such acts and omissions by staff at the Richmond SSLC, as more fully described above, including and especially the failure to provide David Taylor necessary modifications to his environment to assure his safety (i.e., provide a video camera for security purposes), thereby violated his rights pursuant to the ADA, 42 U.S.C. § 12132, *see also* 28 C.F.R. §35.130.

159.    Such acts and omissions by staff at the Richmond SSLC, as more fully described above, including and especially the failure to provide David Taylor necessary accommodations to his environment to assure his safety (i.e., provide a video camera for security purposes), thereby violated his rights pursuant to the ADA, 42 U.S.C. § 12132, *see also* 28 C.F.R. §35.130.

160.    In addition and in the alternative, a violation of the ADA also exists because the Richmond SSLC has intentionally discriminated against David Taylor on the basis of his disability.

## IX. <u>RATIFICATION</u>

161.   Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

162.   Defendant ratified the acts, omissions and customs of Richmond SSLC personnel and staff.

163.   As a result the Defendant is responsible for the acts and omissions of staff persons who were otherwise responsible for the safety of David.

## X. PROXIMATE CAUSE

164.   Plaintiffs incorporate by reference all the above related paragraphs with the same force and effect as if herein set forth.

165.   Each and every, all and singular of the foregoing acts and omissions, on the part of Defendants, taken separately and/or collectively, jointly and severally, constitute a direct and proximate cause of the injuries and damages set forth herein.

## XI. DAMAGES

166.   Plaintiffs incorporate by reference all the above related paragraphs, as if fully set forth.

167.   As a direct and proximate result of the Defendants' conduct, David Taylor has suffered injuries and damages, which he, by and through his personal representative, may seek compensation thereby, all within the jurisdictional limits of this court, including but not limited to the following:

a.   Physical pain and suffering in the past;

b.   Mental anguish in the past;

c.   Loss of Consortium in the past, including damages to the family relationship, loss of care, comfort, solace, companionship, protection, services, and/or physical relations;

d.   Loss of Consortium in the future including damages to the family relationship, loss

of care, comfort, solace, companionship, protection, services, and/or physical

relations; and

e.      Disfigurement in the past.

168.    By reason of the above, Plaintiffs have suffered losses and damages in a sum within the

jurisdictional limits of the Court and for which this lawsuit is brought.

## XII. <u>ATTORNEY FEES</u>

169.    Plaintiffs incorporate by reference all the above related paragraphs, as if fully set forth

herein

170.    It was necessary for Plaintiffs to retain the undersigned attorneys to file this lawsuit. Upon

judgment, Plaintiffs are entitled to an award of attorney fees and costs pursuant to 42

U.S.C. §12133 and 29 U.S.C. §794a.

## XIII. <u>DEMAND FOR JURY TRIAL</u>

171.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a jury trial for all

issues in this matter.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs pray for judgment against

Defendant in the manner and particulars noted above, and in an amount sufficient to fully

compensate them for the elements of damages enumerated above, judgment for damages, recovery

of attorney's fees and costs for the preparation and trial of this cause of action, and for its appeal if

required, together with pre- and post-judgment interest, and court costs expended herein, and for

such other relief as this Court in equity, deems just and proper and for such other relief as the Court

may deem just and proper in law or in equity.

Respectfully submitted,

Cirkiel & Associates, P.C.

/s/ Martin J. Cirkiel
Martin J. Cirkiel, Esq.
State Bar No. 00783829
1901 E. Palm Valley Blvd.
Round Rock, Texas 78664
(512) 244-6658 [Telephone]
(512) 244-6014 [Facsimile]
marty@cirkielaw.com

Michael Zimmerman, Esq.
State Bar No. 22271400
The Zimmerman Law Firm
3501 W. Waco Drive
Waco, Texas 76710
(254) 752-9688 [Telephone]
(254) 752-9680 [Facsimile]
mzimmerman@thezimmermanfirm.com


Greg White, Esq.
State Bar No. 21329050
P. O. Box 2186
Waco, Texas 76703
(254) 717-5728 [Telephone]
(866) 521.5569 [Facsimile]
greg.white@texapplaw.com

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing has been forwarded to the following parties on this 21st day of May, 2012 by Notice of Electronic Filing from the Clerk of the Court:

Daniel C. Perkins, Esq.
Eric L. Vinson, Esq.
General Litigation Division
Office of The Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120 [Telephone]
(512) 320-0667 [Facsimile]

**Attorneys For The Richmond State
Supported Living Center**

/s/ Martin J. Cirkiel
Martin J. Cirkiel