IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LARRY PAUL TAYLOR, Individually | § | |
| and Upon Behalf of the Heirs of the | § | |
| Estate of David Paul Taylor , | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:11-3740 |
| | § | |
| RICHMOND STATE SUPPORTED | § | |
| LIVING CENTER, | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

Pending before the Court is Defendant Richmond State Supported Living Center's ("RSSLC") Motion to Dismiss (the "Motion") [Doc. # 26] seeking dismissal of all claims asserted by Plaintiff Larry Paul Taylor, individually and on behalf of the heirs of the Estate of David Paul Taylor ("Plaintiffs"). Plaintiffs are the parents and heirs of David Paul Taylor, a severely mentally disabled individual who died while in the care of RSSLC. Plaintiffs sue for damages based on RSSLC's allegedly intentional violations of Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 42 U.S.C. § 794, and the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101, *et seq.* and 28 C.F.R. § 35. After careful consideration of the pleadings, the parties' arguments, and the applicable law and construing the complaint

in the light most favorable to Plaintiffs, the Court concludes that dismissal is not warranted at this time and denies the Motion.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

According to the Second Amended Complaint (filed after the Motion was submitted), RSSLC is a State of Texas supported living center with hundreds of beds for individuals with mental retardation and developmental disabilities.  Plaintiffs allege that RSSLC handled "temporary respite admissions, emergency services, and long term placements for individuals with mental retardation or developmental disabilities."   Second Amended Complaint ("Complaint"), ¶ 71.

Plaintiffs allege that David Taylor was born in 1982, prematurely after 26 weeks gestation, and that he ultimately was diagnosed with severe autism and profound mental retardation, with an IQ of less than 20. *Id.* ¶ 74.  David never learned to speak or to communicate reliably, "had no self-help skills and needed to be fed, bathed and toiled, like an infant." *Id.* ¶ 75.  David suffered also from a "severe Behavior Disorder, and would slap himself, bang his head and dig flesh from cheeks, temple, thumbs and fingers.  He would also pack items like paper in bandages into his nose.  He had a 'Pica'[,] a disorder where he would attempt to put in his mouth and eat non-food items." *Id.* ¶ 76.  Plaintiffs further allege that David was "difficult to manage because he was totally dependent upon staff for all his needs . . . but [also]

was adverse to their very attempts to assist him. David would become aggressive with other residents and staff as well, and would bite, slap and kick at them, often accompanied with extremely loud screaming." *Id.* ¶ 77. He also had "rumination or vomiting." *Id.* ¶ 80. He was admitted as a permanent resident to the RSSLC, a "more restrictive and secure environment" than the residential community he was previously in. *Id.* ¶ 78. David allegedly was "one of the most severely and profoundly retarded residents." David was housed on the Neches unit where others with severe disabilities at RSSLC were placed, *id.* ¶¶ 79, 124, 125, and was "among the most difficult to treat." *Id.* ¶ 79. Even among the Neches Unit sub-group of extremely disabled individuals, David "was even more disabled than most, requiring one-to-one supervision during waking hours and . . . 'enhanced supervision' after going to bed." *Id.* ¶ 79.

Plaintiffs allege that David's chart contained references to close to 100 injuries during his stay. *Id.* ¶ 81. Plaintiffs allege also that there was no risk-management analysis or assessment noted in David's chart. *Id.* ¶ 82. He did have a "treatment plan" which "reflected interventions due to the fact that he was medically fragile"; "services and interventions" related to his eating disorders, weight issues, problems with Pica and multiple self-injurious behavioral problems; significant issues in ambulation; recognition that he was a "major risk for falling"; inability to

communicate; and a severe mental health diagnosis. *Id.* ¶¶ 83-87.  RSSLC's doctors ordered one-on-one supervision at all times.  Plaintiffs allege that staff working with David needed to be properly (*i.e.*, specially) trained and supervised, but they were not. David's treatment record, according to Plaintiffs, reflects training relating to his particular problems on only the rumination issue.  Plaintiffs conclude that the failure to correctly train David and RSSLC staff "ultimately led to his injury and death."

Plaintiffs allege a detailed chronology of events starting in the early morning of October 5, 2010, and culminating in David being found dead on the morning of October 8, 2010.  Plaintiffs allege the following:  Rivers Glover, a RSSLC employee, brutally assaulted David in the early morning of October 5, 2010, because David would not return to bed after being assisted to the bathroom.  Because of David's oppositional behavior, Plaintiffs allege, Glover used physical force, indeed, he later admitted, "excessive" force, to restrain David or to compel David to comply with his requests.  David apparently missed the bed when pushed by Glover and David hit a pole on the bed which caused severe injury to David's abdomen, apparently, rupturing his small intestine. *Id*. ¶¶ 93, 96, 97, 99, 100, 101, 113; Sealed Supplement.  Glover reported to the nurse in charge, Registered Nurse Amara Oparanozie, that David had some external bruising, which had become apparent, but stated in the report that it was due to David hitting his elbow against the bathroom door. *Id.* ¶ 102.  Glover noted the

next morning that there were injuries to David's right upper arm and right upper back. *Id.* ¶ 103.  Nurse Oparanozie noted that David apparently could move his extremities. *Id.*  ¶ 104.  On October 7, another nurse (on the afternoon shift) reported that David "had again been injured" and was hurt when going to the bathroom because he again had hit the door.  *Id.* ¶ 105.  A third nurse (apparently on the afternoon shift on October 7) reported that David was having trouble moving his extremities and referred him to sick call for the next morning.  She also reported her concerns to the Campus Nurse Supervisor.  *Id.* ¶ 106.  The file contains another incident report dated October 7 by an unspecified author, stating that David apparently suffered the above-noted injuries while "lying in his bed because of problems with the mattress."  *Id.* ¶ 107.  Nurse Oparanozie worked the overnight shift from October 7 to 8.  She reported that she visited David at 10:45 p.m. and 4:30 a.m., and that his vital signs appeared to be normal.  *Id.* ¶¶ 108-109.  Oparanozie later acknowledged that these reports were untrue in that she had not taken David's vital signs.  *Id.* ¶ 114.  At 5:00 a.m. on October 8, Rivers called Oparanozie and reported that David was not breathing. Resuscitation efforts were unsuccessful.

The medical examiner later concluded that David suffered a "blunt abdominal trauma" with associated rupture of the small intestine area, and bacterial peritonitis (inflammation of the inner wall of the abdomen), and an acute hemorrhage within the

left thyohyoid muscle" in the neck area.  *Id*. ¶ 115.  Plaintiffs allege that it "has been opined that had the nurse in fact checked David's vital signs in a timely manner, he likely would have survived his injuries."  *Id*. ¶ 120.[1]

Plaintiffs filed suit against RSSLC claiming it violated Section 504 and the ADA through the conduct of its staff who were responsible for caring David on October 5 through 8, 2010, as well as earlier in 2010.  When viewed in the light most favorable to Plaintiffs, Plaintiffs seek damages from RSSLC on the ground that RSSLC through it staff members, including but not limited to Glover and Oparanozie, discriminated against David by intentionally refusing to provide services to him because he was so severely disabled in that he could not communicate and had numerous especially difficult behavioral and retardation problems.  More specifically, Plaintiffs claim RSSLC, a recipient of federal funds, intentionally discriminated against David, ultimately causing his death, in violation of Section 504, by:

(1)    failing to provide treatment services and a plan "to the extent required under the law" to accommodate David's problems of suffering repeated severe injuries (self-inflicted, from falls, and from the conduct of others), *id.* ¶¶ 129, 149;

(2)    by failing to provide particularized training for staff to deal with especially severely disabled persons, like David, and assist in preventing David's

---

[1]      Plaintiffs allege that Rivers and Oparanozie were charged with a felony "injury to a person with a disability." TEX. PENAL CODE ANN. § 22.04; *id.* ¶¶ 121-122.

injuries in his bedroom and bathroom, *id.* ¶¶ 130, 133, 134, 135;

(3)     by failing to provide supervision of staff, quality assurance of staff work, and training on staff reporting of abuse, which could have avoided staff negligence as to or abuse of David, or could have remedied lack of staff training to deal with David's well known appositional behaviors, *id.* ¶¶ 131-132; and

(4)     by failing to provide proper training of nursing staff on acting on and reporting problems with patients, *id.* ¶ 136; *see id.* ¶¶ 138-141.

Plaintiffs further contend, based on the alleged chronology and David's severe disabilities, that RSSLC acted in "bad faith" or with "gross misjudgment" in regard to David's individualized treatment plan and provided services to David that were in "gross deviation from professionally accepted standards of care." *Id.* ¶¶ 150-152. Further, Plaintiffs allege that RSSLC ratified the acts of its personnel and staff. *Id.* ¶¶ 168.

Plaintiffs also allege that RSSLC violated Title II of the ADA by failing to provide treatment and services, by denying nursing and medical care commensurate with David's unique and individualized needs, by failing to provide modifications to David's environment to assure his safety, such as using a video camera for security purposes, and by engaging in the conduct alleged above. *Id.* ¶¶ 158-165. Plaintiffs allege these acts violate the ADA as intentional discrimination against David on the

basis of his disability.

## II.   APPLICABLE LEGAL STANDARDS

### A.   Motions to Dismiss

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure is viewed with disfavor and is rarely granted. *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (citing *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)). The complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true. *Harrington*, 563 F.3d at 147. The complaint must, however, contain sufficient factual allegations, as opposed to legal conclusions, to state a claim for relief that is "plausible on its face." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Patrick v. Wal-Mart, Inc.*, 681 F.3d 614, 617 (5th Cir. 2012). When there are well-pleaded factual allegations, a court should presume they are true, even if doubtful, and then determine whether they plausibly give rise to an entitlement to relief. *Iqbal*, 556 U.S. at 679. Additionally, regardless of how well-pleaded the factual allegations may be, they must demonstrate that the plaintiff is entitled to relief under a valid legal theory. *See Neitzke v. Williams,* 490 U.S. 319, 327 (1989); *McCormick v. Stalder,* 105 F.3d 1059, 1061 (5th Cir. 1997).

**B.     Claims Under Title II, Part A, of the ADA and Rehabilitation Act § 504**

The most recent case decided by the Fifth Circuit concerning the ADA and Section 504 is *Delano-Pyle v. Victoria Cty., Texas*, 302 F.3d 567 (5th Cir. 2002).  This decision provides important guidance about the purpose and requirements of the ADA and Section 504, the statutes forming the basis of Plaintiffs claims.

The ADA states in relevant part:  "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132 (1990); *see also* 28 C.F.R. § 35.130(b)(7) ("A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.").  The ADA is a federal anti-discrimination statute designed "[t]o provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."  *Delano-Pyle*, 302 F.3d at 574 (citing *Rizzo v. Children's World Learning Ctrs., Inc.*, 173 F.3d 254, 261 (5th Cir. 1999)) (footnote omitted).

Section 504 provides:  "No otherwise qualified individual with a disability in

the United States . . . shall, solely by reason of her or his disability, be excluded from

the participation in, be denied the benefits of, or be subjected to discrimination under

any program or activity receiving Federal financial assistance or under any program

or activity conducted by any Executive agency."  29 U.S.C. § 794 (1995).  This

provision was enacted "'to ensure that handicapped individuals are not denied jobs or

other benefits because of prejudiced attitudes or ignorance of others.'"  *Delano-Pyle*,

302 F.3d at 574 (quoting *Brennan v. Stewart*, 834 F.2d 1248, 1259 (5th Cir. 1988))

(footnote omitted).

     The Fifth Circuit observed that the "language in the ADA generally tracks the

language set forth in [Section 504, and i]n fact, the ADA expressly provides that '[t]he

remedies, procedures and rights' available under [Section 504] are also accessible

under the ADA."   *Id.* at 574 (quoting 42 U.S.C. § 12133 (1995)).    Thus,

"[j]urisprudence interpreting either section is applicable to both." *Hainze v. Richards*,

207 F.3d 795, 799 (5th Cir. 2000); *accord D.A.* ex rel. *Latasha A. v. Hous. Indep. Sch.

Dist.*, 629 F.3d 450, 453 (5th Cir. 2010) ("Because this court has equated liability

standards under § 504 and the ADA, we evaluate D.A.'s claims under the statutes

together.").

     A plaintiff asserting a private cause of action for violations of the ADA or

Section 504 may only recover compensatory damages upon a showing of intentional

discrimination.[2]  *Delano-Pyle*, 302 F.3d at 574-75 (citing *Carter v. Orleans Parish Pub. Sch.*, 725 F.2d 261, 264 (5th Cir. 1984)).   "Discrimination on the basis of disability differs from discrimination in the constitutional sense.   To determine whether [the defendant] discriminated against [the plaintiff] on the basis of his disability, [the courts] examine the ADA itself and its own definitions of discrimination."  *Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 672 (5th Cir. 2004).

To establish a *prima facie* case of discrimination under Title II of the ADA and Section 504, "a plaintiff must demonstrate:  (1) that he is a qualified individual within the meaning of the ADA; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability."

---

[2]    The Court of course applies this Fifth Circuit standard, but notes the standard is a minority view.  The Second, Eighth, Ninth, Tenth, and Eleventh Circuits require the lesser proof of "deliberate indifference."  *See and compare Delano-Pyle*, 302 F.3d at 575 *with Liese v. Indian River Cty. Hosp. Dist.*, No. 10-15968, 2012 WL 5477523 (11th Cir. Nov. 13, 2012) ("[A]ll but one of our sister circuits to have addressed this issue have similarly concluded that a claim for compensatory damages under § 504 of the RA may be satisfied by a showing of deliberate indifference.").  The Eleventh Circuit very recently held that "[t]o recover compensatory damages under § 504, the [plaintiffs] must show that (1) [the defendant] violated their rights under § 504, and (2) that [the defendant] did so with  discriminatory intent."  *Id.* at *6 (citing *Wood v. President & Trs. of Spring Hill Coll.*, 978 F.2d 1214, 1219 (11th Cir. 1992)).  Plaintiffs may establish discriminatory intent by proving that the defendant acted with deliberate indifference; the plaintiff need not demonstrate the higher standard of discriminatory animus.  *Id.* at 9-12.

*Melton* , 391 F.3d at 671-72 (citing *Lightbourn v. Cnty. of El Paso, Tex.*, 118 F.3d 421, 428 (5th Cir. 1997)).

## III.  **ANALYSIS**

Defendant RSSLC's Motion was directed at Plaintiffs' First Amended Complaint.  Defendants contend that Plaintiffs have not stated a claim for discrimination under the ADA or Section 504 for several reasons:

(1)  Plaintiffs have not pleaded facts that plausibly satisfy the third element of the ADA and Section 504 *prima facie* case: that RSSLC had any policies, procedures, or customs that were applied differently to David because of his disability or that any acts or omission taken by RSSLC's personnel with respect to David were taken because of his disability;[3]

(2)  Plaintiffs have not pleaded the existence of any non-disabled or less disabled individuals to whom RSSLC's policies, practices, and/or customs were applied more favorably; and

(3)  Plaintiffs cannot impute to RSSLC through *respondent superior* the allegedly criminal conduct of two of Defendant RSSLC's employees.

The Court concludes that the Motion should be denied at this time.  Regarding Defendant's first contention, the Court granted Plaintiffs' request to file a Second Amended Complaint after the Motion had been presented.  Therefore, the Court

---

[3]    There is no dispute that RSSLC is a recipient of federal funds.

measures RSSLC's arguments against that recent filing.  The Second Amended Complaint includes more factual allegations than the prior pleadings and contains numerous assertions that RSSLC's alleged mistreatment of David was "because of" or "due to" his profound and unusual disabilities, such as his oppositional behaviors and his inability to communicate his thoughts, needs, or concerns.  The Second Amended Complaint addresses the alleged deficiencies of factual allegations raised by Defendants.

To the extent that Defendant contends, in its second argument, that Plaintiffs must, as with a claim under 42 U.S.C. § 1983, plead or prove a custom or policy by a policymaker, that argument is rejected.  *Delano-Pyle*, 302 F.3d at 575 ("The ADA expressly provides that a disabled person is discriminated against when an entity fails to '*take such steps as may be necessary* to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services.'" (quoting 42 U.S.C. § 12182(b)(2)(A)(iii))).  "Congress intended to impose an affirmative duty on public entities to create policies or procedures to prevent discrimination based on disability." *Id.* (citing 42 U.S.C. § 12182(b)(2)(A)(ii)-(iii) (1985)).  "[N]either a policymaker, nor an official policy must be identified for claims asserted under the ADA or [Section 504] . . . ." *Id.*

The Court also is not persuaded that Plaintiffs' claims are doomed by their

failure to identify in the pleadings a specific comparator, *i.e.*, non-disabled or less disabled individuals to whom RSSLC's policies, practices, and/or customs were applied more favorably.  Plaintiffs allege that it was David's extremely severe disabilities that were the basis of the omissions or affirmative mistreatment he experienced, and infer that there was training and care suitable for other less disabled patients.  In any event, the law is unclear whether a comparator is necessary under the ADA and Section 504.[4]  The Court finds Plaintiffs' theories somewhat novel, given that RSSLC is an institution that handles only patients with disabilities, but Plaintiffs' theories do not appear to be precluded by any reported cases cited by the parties or that the Court has located independently.  The Court declines to dismiss Plaintiffs' ADA and Section 504 claims on this basis at this time.  Plaintiffs' allegations, essentially, that RSSLC intentionally denied David services because of his unique impairments and thus discriminated against him in the ways set forth above are sufficient at this stage.

Defendant further contends that Plaintiffs' claims fail because they cannot impute to RSSLC through *respondent superior* the allegedly criminal conduct of two of Defendant RSSLC's employees, Glover and Oparanozie, who have been charged

---

[4]    While it is likely, as a practical matter, that in order to persuade a finder of fact that RSSLC's allegedly poor care of David was attributable to his severe and unique disabilities, Plaintiffs will need to demonstrate that other identifiable patients received better care than he, the Court declines to require that Plaintiffs identify in their pleadings a specified comparator.

criminally. First, the Second Amended Complaint does not limit the wrongs by RSSLC to actions by these two employees. Second, Plaintiffs have pleaded that these employees' conduct was ratified by their supervisors or RSSLC's management. Significantly, in *Delano-Pyle*, the Fifth Circuit adopted the rule of many other circuits that under the ADA or Section 504: "the public entity is liable for the vicarious acts of *any* of its employees as specifically provided by the ADA." 302 F.3d at 575-76 (citing *Rosen v. Montgomery Cnty., Md.*, 121 F.3d 154, 157 (4th Cir. 1997); *Silk v. City of Chi.*, 194 F.3d 788, 806 (7th Cir. 1999); *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1141 (9th Cir. 2001); *Mason v. Stallings*, 82 F.3d 1007, 1009 (11th Cir. 1996)).[5] Defendant's *respondent superior* argument is rejected at this time.

## IV.    CONCLUSION AND ORDER

For the reasons set forth above, the Court concludes that Defendant's Motion should be denied. It is therefore

**ORDERED** that Defendant's Motion to Dismiss [Doc. # 26] is **DENIED without prejudice**.

Signed this **30th day** of **November, 2012.**

Nancy F. Atlas
United States District Judge

---

[5]    Moreover, while these individuals have been indicted, there is a presumption of innocence and there is no proof before the Court that they committed criminal acts.